HANOVER FIRE INSURANCE COMPANY v. A. J. GUSTIN.

FILED JUNE 5, 1894.   No. 5185.

1. **Fire Insurance**: PROVISION OF POLICY FOR WATCHMAN: CONSTRUCTION. The statement in an application for the issuance of a policy of insurance on a planing mill, that "a watchman is kept on the premises during the night and at all other times when the works are not in operation or the workmen present," should receive a reasonable construction, and therefore the mere temporary absence of such watchman within the time contemplated did not necessarily relieve the insurer from liability for loss caused by a fire which originated during such absence.

2. ———: PROOF OF LOSS: QUESTION FOR JURY. Where the insured was orally examined as to the loss by an agent of the insurer, whose duty it was to look after and adjust its losses, and such examination was by such agent reduced to writing and by the assured subscribed and sworn to in the belief that such statement was a satisfactory compliance with the requirement of proof of loss, the question whether or not the acts or language of such agent induced such belief and excused the making of other proof with technical precision was properly left to the jury for determination.

3. ———: ATTORNEY'S FEE. The provisions of chapter 48 of the Session Laws of 1889 empower the courts of this state, upon rendering judgment against an insurance company on any policy of insurance on real property, to allow plaintiff a reasonable sum as an attorney's fee, to be taxed as part of the costs of the case in which judgment is rendered.

ERROR from the district court of Buffalo county. Tried below before HAMER, J.

The facts are stated by the commissioner.

*Thomas D. Crane* and *Bartlett, Crane & Baldrige,* for plaintiff in error:

The failure of the assured to comply with the requirement concerning a watchman avoids the policy. (*First*

Hanover Fire Ins. Co. v. Gustin.

*Nat. Bank of Ballston v. Insurance Company of North America*, 50 N. Y., 45; *Ripley v. Ætna Ins. Co.*, 30 N. Y., 136; *Glendale Woolen Co. v. Protection Ins. Co.*, 21 Conn., 19; *New York Belting & Packing Co. v. Washington Fire Ins. Co.*, 10 Bos. [N. Y.], 428; *Gloucester Mfg. Co. v. Howard Fire Ins. Co.*, 5 Gray [Mass.], 497; *Crocker v. People's Mutual Fire Ins. Co.*, 8 Cush. [Mass.], 79; *Lee v. Howard Fire Ins. Co.*, 3 Gray [Mass.], 583; *Glen v. Lewis*, 8 Exch. [Eng.], 607; *Aurora Fire Ins. Co. v. Eddy*, 49 Ill., 106; *Percival v. Maine Ins. Co.*, 33 Me., 242; *Hovey v. American Mutual Ins. Co.*, 2 Duer [N. Y.], 554; *Whitlaw v. Phœnix Ins. Co.*, 28 U. C. C. P., 53; *Blumer v. Phœnix Ins. Co.*, 45 Wis., 622; *Sheldon v. Hartford Fire Ins. Co.*, 22 Conn., 235; *Houghton v. Manufacturers Mutual Fire Ins. Co.*, 8 Met. [Mass.], 114; Ostrander, Fire Insurance, sec. 138.)

*Calkins & Pratt, contra*, contending that the warranty in reference to the watchman should not be so construed as to extend to the future, cited: *Gilliat v. Pawtucket Mutual Fire Ins. Co.*, 8 R. I., 282; *O'Neill v. Buffalo Fire Ins. Co.*, 3 N. Y., 122; *Frisbie v. Fayette Mutual Ins. Co.*, 27 Pa. St., 325; *Schmidt v. Peoria Marine & Fire Ins. Co.*, 41 Ill., 295; *Stout v. City Fire Ins. Co. of New Haven*, 12 Ia., 371.

Ryan, C.

With the final submission of this case there was submitted a motion of the defendant in error to strike out of the supplemental transcript the affidavits of Thomas B. Crane and H. M. St. Clair, for the reason that they are no part of the record. This motion must be sustained, for the affidavits appear to have been attached to a motion to vacate an order allowing attorney fees to Messrs. Calkins & Pratt. Whether they were used on the hearing of this motion is left entirely to conjecture, for neither their purpose nor

their use was ever shown by the bill of exceptions. They were, therefore, improperly made a part of the record.

The defendant in error sued the plaintiff in error in the district court of Buffalo county on a policy of insurance on planing mill property in Kearney. There were $200 on engine, boiler, and tools, and $800 on planing mill and machinery. There were six policies of $1,000 each on the planing mill property, exclusive of that upon which this suit was brought. It is apparently conceded that these other policies were settled satisfactorily. These settlements were more advantageous to the insurance companies concerned than the rate fixed by the jury as that upon which plaintiff in error must settle. This fact is referred to in argument, but it can have no bearing in favor of the plaintiff in error, for settlements are often, perhaps usually, made in consideration of concessions. The evidence justified a verdict in the sum of $775, and as the plaintiff elected that the sum for which it was liable should be fixed in that way, it must accept this estimate as final.

It would subserve no useful purpose to consider in detail the several errors alleged as to the introduction of testimony, neither as respects its admission or rejection. In each ruling the action of the court was correct; indeed, no argument is made in the brief of plaintiff in error calling in question the correctness of any of these rulings. The instructions given were as follows:

"1. The burden of the proof is upon the plaintiff; before he can recover he must establish his case by a preponderance of the evidence.

"2. If you find for the plaintiff, you should allow him only the actual damages sustained, if any, and no more. You can allow nothing by way of punishing the insurance company for failing to pay the loss sustained, if there was a loss.

"3. If you find that the plaintiff sustained a loss by fire, and that the defendant is liable to pay a part of the

same by reason of the insurance policy which was issued, you will be careful to assess against the defendant company its *pro rata* share of the actual loss sustained, not exceeding the limit of liability mentioned in the policy.

"4. If you find from the evidence that the defendant's agent, shortly after the fire, made out and requested the plaintiff to sign a paper which he called a proof of loss, or which he induced the plaintiff to believe was a proof of loss, it will be considered that the defendant had knowledge of the loss, and no other or greater proof will be required, although the paper was not such a proof of loss as the policy contemplated."

The plaintiff in error asked no instructions, but contents itself with criticising in argument those given in the following very general language:

" 5. The instructions given by the court on its own motion not only do not fairly present the issues, but are in effect strongly argumentative in favor of Gustin and assumptive of his right to recover.

" 6. The instructions given by the court numbered 2, 3, and 4 are, whether read severally or together, very prejudicial to the company."

These propositions present no question with sufficient tangibility to require consideration.

The trial was begun with no defense pleaded of special importance in view of the evidence afterwards adduced, except the failure to make proof of loss as provided by the terms of the policy sued on. This defense was presented by the answer in the following language:

" 3. This defendant, further answering said petition, states and alleges that in and by said policy of insurance it was specially provided that in case of loss or damage under said policy the assured should give immediate notice thereof to the general agent of said company in the city of New York, and as soon thereafter as possible furnish proof of loss, containing a particular account of said loss or dam-

age, signed and sworn to by said assured and by the assured
only (except in case of death, and then by the legal repre-
sentatives), stating when and how the fire originated, the
exact nature and title of the assured and of all others in
the property, the cash value of each item thereof, and the
amount of loss thereon, and setting forth a copy of the
written part of the policy. And the defendant further
alleges that after said alleged loss no notice was given by
said assured to the general agent of said defendant as re-
quired by the terms of said policy, and that no proofs of
loss containing a particular account of said loss or damage
was furnished as provided by the terms of said policy,
and no proofs of any kind or nature of said alleged loss,
if any loss there was, was furnished to said company de-
fendant as required by the terms of said policy."

There was no immediate notice given to the plaintiff in
error in the formal manner required by the provisions of
the aforesaid policy. The loss was on February 17, 1890.
C. E. Babcock was examined as a witness in behalf of the
insurance company, and testified that he was its special
agent for the state of Nebraska; that his agent advised
him of the loss by fire of the planing mill; that he went
to Kearney and saw Mr. Gustin on February 20, 1890;
that witness said to Mr. Gustin that the policy said that
witness was to examine Mr. Gustin about the fire, its ori-
gin, how he came by the property, where Mr. Gustin was
during the fire, and other matters connected with the run-
ning of the mill; that Mr. Gustin told witness step by
step,—in fact, told witness all about it; that witness wrote
it out as it was told witness and read it over to Mr. Gustin
carefully, and that Mr. Gustin signed it and swore to it be-
fore a notary public by the name of Brown. Mr. Gustin's
evidence was that Mr. Babcock called this paper a proof
of loss. This Mr. Babcock denied. Frank Brown, the
notary public before whom the statement was sworn to,
testified that Mr. Gustin asked him to swear him to the

paper designating it as a proof of loss, and that this was done in the presence of Mr. Babcock. The evidence of Norris Brown, brother and business partner of Frank Brown, was to the same effect. So also was that of Mr. Gustin. This was denied by Mr. Babcock. This affidavit of A. J. Gustin was, in substance, that he purchased the property of Thomas A. King on September 20, 1889, the consideration being $5,500 and a farm in Holt county of 160 acres; that he paid the unearned premium on $6,000 on the mill building, boiler, engine, tools, and mill machinery pending on the mill, which premium amounted to $245. There were further details concerning the conditions and consideration upon which he acquired the property. Relative to the fire he said that it occurred on February 17, 1890, about 6 o'clock P. M.; that he had left the premises a short time before the fire with his watchman, E. J. Thorpe, who went after a lock for an outside building and who said he was going to supper before he returned; that the duties of the watchman were to watch and care for the safety of the premises and do a general cleaning up and sweeping; that his time was from 5:30 P. M., to 7:30 A. M. next morning. Mr. Gustin in his affidavit further said that when he and the watchman left the premises there was no fire about them, except under the boilers and in the stove in the office; that the fire was supposed to have originated in the carpenter shop adjoining and communicating with the mill, said shop being used at the time as a store-room for moulding, sash, doors, and blinds; or, he said, the fire might have originated on the outside and south side of the mill, as one of the men had hauled manure and piled it around the bottom of the building to keep out the cold, and a cigar or something of that kind might have been the cause of the fire; that there was about $1,500 worth of stock in the mill at the time of the fire, consisting of all the various forms that lumber enter into in such an establishment for the trade, nails, and

57

screws; that other parties had stock in the mill as follows:
Gilcrist & Co., somewhere from 3,000 to 5,000 feet yellow
pine lumber; that the mill on the date of the fire was op-
erated from 9 o'clock A. M. to 6 o'clock P. M.; that no
one was interested with the affiant in the ownership of the
mill property except his brother-in-law, Mr. Gilcrist, and
he was only entitled to one-half of the profits for six months
from the time Mr. Gustin took the mill; that his pay-roll
amounted to from $75 to $200 per week, owing to volume
of business; that he could not say that the operation of the
mill was profitable, on account, as he supposed, of the
winter season coming on.    Technically this may not have
fulfilled all formal requirements of the policy as to proof
of loss, and yet it so nearly does so that Mr. Gustin might
readily be credited when he stated that such he supposed
the affidavit amounted to and was intended for.    It appears
from the testimony of Mr. Babcock himself that Mr.
Gustin willingly submitted to the oral examination, and if
there was any fact which Mr. Babcock desired explained
there seems to have been no room for question that Mr.
Gustin would have complied with a request for explana-
tion.    It is clear from the evidence that Mr. Babcock's spe-
cial business at Kearney was to ascertain whether or not
the claim of Mr. Gustin should be paid, and that if he had
so decided, there would have been no occasion for this liti-
gation.    Under such circumstances it is not to be wondered
at that Mr. Gustin supposed that he had fully complied
with all requirements as to proof of loss, and if this con-
clusion was superinduced by the language or conduct of
Mr. Babcock, the proof made by the affidavit of Mr. Gus-
tin should be held good as against the company for which
Mr. Babcock was the agent and representative.

During the progress of the trial the following amend-
ment was, by leave of court, made to the answer of the
insurance company: "And the defendant further alleges
that the fire alleged to have occurred in the petition of the

plaintiff occurred through the fault and negligence of the plaintiff as follows: That said policy of insurance and the application of the insured, which was made a part of said policy sued upon, and the warranty upon the part of the assured, expressly provided that a watchman was to be kept on the premises insured during the night and at all other times when the works are not in operation or when the workmen are not present.   And the defendant alleges that at the time said fire occurred the watchman, provided as aforesaid to be kept on said premises during the night and at all other times when the works were not in operation, was by the plaintiff requested and allowed to be away and absent from said premises after said works had ceased operations for the day; and the defendant alleges that at the time said fire occurred said watchman was away from said premises by the act, procurement, and assent of the plaintiff, and that it was during said absence of said watchman that said fire originated and started which caused the damages to said property by fire, and for which this suit is brought."

The questions and answers which it is pleaded amounted to an express warranty that a watchman was to be kept on the premises, etc., were in the following language:

21. Watchman.—Is one kept on the premises during the night and at all other times when the works are not in operation, or when the workmen are not present?

A. Yes.

Q. Is any other duty required of the watchman than watching for the safety of the premies?

A. Yes, cleaning the floors and premises.

The evidence shows that the fire occurred about half past seven o'clock, and that the watchman, with Mr. Gustin, left the premises about 6:15 o'clock.   Before their departure, however, the watchman had inspected the different parts of the mill and found everything apparently safe from fire. He locked up the building and went to the business part

of the city of Kearney to buy a padlock with which to
secure a door of an outside building. While he was gone
he went to the depot of the Burlington & Missouri River
Railroad Company and purchased a ticket for a lady friend
of his, and in the interval between his leaving the planing
mill and returning thereto he ate his supper. While on
his way to the planing mill to resume his duties of watch-
man the alarm of fire was sounded. It is insisted that the
absence of the watchman for the purposes named, with the
assent of Mr. Gustin, necessarily avoided the policy. To
this doctrine we cannot assent. Even giving the statements
of the application, "that a watchman is kept on the prem-
ises during the night and at all other times when the works
are not in operation," the effect of a warranty,—a claim
not necessary now to be settled,—the language should
receive a reasonable construction. We are aware thas
on this proposition there is not accord of authorities; pos-
sibly in number they are adverse to this view, yet it is
believed that the language of Judge Shaw in *Crocker v.
People's Mutual Fire Ins. Co.*, 8 Cush. [Mass.], 79, is reason-
able and just. He said: "The stipulation, 'a watchman
kept on the premises,' inserted as it is in the body of the
policy immediately after the description of the property
insured, is in the nature of a warranty, and must be sub-
stantially complied with by the assured, but the terms are
not explicit as to the time and manner of keeping a watch.
It does not stipulate for a constant watch. It therefore
requires construction as matter of law to determine what
is meant in this policy by keeping a watch. It relates to a
factory, to its safety against fire, and this depends upon the
habit or practice in this respect, and upon the fact whether
that usage has been followed. When there is an express
stipulation that a thing shall be done, but the contract is
silent as to the time and manner, the law holds that it must
be reasonable in this respect, having regard to the object
and purpose of the stipulation, in this case to the safety of

the building. If it is done in the manner in which men of ordinary care and skill in similar departments manage their own affairs of like kind, this is one strong ground to hold it reasonable and to warrant the admission of evidence of usage."

The same principle requiring a reasonable construction of the language used is recognized and enforced in *Sheldon v. Hartford Fire Ins. Co.*, 22 Conn., 235; *Frisbie v. Fayette Mutual Ins. Co.*, 27 Pa. St., 325; *Houghton v. Manufacturers Mutual Fire Ins. Co.*, 8 Met. [Mass.], 114; *Percival v. Maine Ins. Co.*, 33 Me., 242; *Stout v. City Fire Ins. Co. of New Haven*, 12 Ia., 371. These views have quite directly received the sanction of this court in *Springfield Fire & Marine Ins. Co. v. McLimans*, 28 Neb., 846. The first paragraph of the syllabus in that case is as follows: "A mere temporary absence of the occupant of a building therefrom will not render void a policy of insurance which contains a provision that the policy shall become void in case the building becomes vacant." Discussing this proposition, MAXWELL, J., for this court said: "The first instruction above set forth submitted to the jury the question whether or not the premises were vacant within the meaning of the terms of the policy when the fire occurred. It certainly was very favorable to the company. A party by effecting insurance upon his dwelling does not thereby impliedly agree that he will remain on guard to watch for the possible outbreak of a fire. He insures his property as a precaution against possible loss. If he is indebted, his duty to his creditors requires this; and if he is not in debt, his duty to his family requires him to procure the insurance. He is not to become a prisoner on the property, however, nor to be charged with laches when, in the pursuit of his business, health, or pleasure, he temporarily leaves the property which still remains his home. The necessity of most persons for temporary absence on business or family convenience is known to every one, and must have been in the

contemplation of the insurer when the policy was issued. A policy of insurance is to be so construed, if possible, as to carry into effect the purpose for which the premium was paid and it was issued. If it does not in fact insure the property covered by it and since destroyed by fire, then the savings of a lifetime may be lost because from a technical defect which did not affect the risk, the company is enabled to evade its duty. Forfeitures are odious in law and should never be enforced unless the court is compelled to do so. (*Dickensen v. State*, 20 Neb., 81; *Estabrook v. Hughes*, 8 Neb., 496; *Hibbeler v. Gutheart*, 12 Neb., 531.) The business of an insurance company is to indemnify those of its patrons who have paid the amount demanded for the risk and sustained loss. Where the loss has not happened through the fault of the insured, why should the insurer be permitted to retain the premium and refuse to perform its contract, or upon what principle of justice are courts required to search for technical objections to relieve it from liability and thereby defraud its patrons? A substantial compliance with the contract is all that is required. A mere temporary absence, which at most is all that is shown in this case, would not affect the risk. (*Stupetski v. Transatlantic Fire Ins. Co.*, 43 Mich., 373, s. c., 5 N. W. Rep., 401; *Cummings v. Agricultural Ins. Co.*, 67 N. Y., 260; *Herrman v. Merchants Ins. Co.*, 81 N. Y., 184; *Phœnix Ins. Co. v. Tucker*, 92 Ill., 64; *Dennison v. Phœnix Ins. Co.*, 52 Ia., 451, s. c., 3 N. W. Rep., 500.) " The proofs in this case justified the application of the principles just quoted. The mere temporary absence of the watchman, accordingly, is held insufficient *per se* to relieve the insurance company of liability.

There remains but one other question, and that is as to the taxation in favor of the defendant in error of an attorney's fee of $200. This fee was taxed under the authority of chapter 48 of the Session Laws of 1889, of which section 1 provided that in case of total loss of the

insured property the amount of the insurance written in the policy shall be taken to be its true value, and that the measure of damage sustained by the party whose property was insured should be fixed accordingly.   Section 2 made applicable the provisions of said act to all policies written or renewed before the date when said act went into effect, and provided that the contracts made by such policies and renewals should be considered to be contracts made under the laws of the state of Nebraska.   Section 3 is as follows: "The court, upon rendering judgment against any insurance company upon any such policy of insurance, shall allow the plaintiff a reasonable sum as attorney fees, to be taxed as a part of the costs."   It is argued that the words "upon any such policy," etc., are restrictive, and that the power to tax costs does not extend further than in cases where a total loss has been suffered.   The first section of the act prescribes what the amount of the damage shall be deemed to be in cases where the loss is total, and its provisions are applicable to any policy of insurance afterward written to insure any real property in this state.   This prospectively applied to all policies which should be written after the act became operative.   Section 2 made the provisions of section 1 applicable to policies of insurance made or renewed prior to the time of said act taking effect. By these two sections all policies in this state upon real property were covered in the first section such as should be made after the act took effect; in the second section, such as should have been previously made or renewed; and the language of section 3 must, therefore, be held to include all policies made in Nebraska with reference to real property.   It is contended, however, that the fee was improperly allowed in this case on account of certain facts probably presented by affidavits in the trial court.   As the affidavits upon which presumably the motion to vacate this allowance of fees was presented have been stricken from the record in this court, we are without means of deter-

mining as a question of fact what force this showing should have received. Under such circumstances the taxation made in the trial court must be assumed to have been correct. At least, we cannot, as asked by plaintiff in error, presume the contrary. The judgment of the district court is

AFFIRMED.